**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Daniel Hamilton,<br><br>               Plaintiff,<br><br>v.<br><br>Yavapai Community College District, et al.,<br><br>               Defendants. | No. CV-15-08095-PCT-GMS<br><br>**ORDER** |

Pending before the Court are Defendant Yavapai Community College and John Morgan's Joint Motion for Summary Judgment (Doc. 169) and Cross Motion for Summary Judgment (Doc. 183), Defendant North-Aire's Motion for Summary Judgment (Doc. 173), and Plaintiff Daniel Hamilton's Motion for Partial Summary Judgment (Doc. 175).

## BACKGROUND

For several years, Defendant Yavapai Community College ("Yavapai") has provided air flight training programs as part of the courses it offers. John Morgan is a Dean at the school who oversaw the Aviation Programs. Yavapai offers both helicopter and fixed-wing training programs, but these motions are centered on the fixed-wing training program.

In 2011, North-Aire Aviation ("North-Aire") entered a Memorandum of Understanding ("MOU") with Yavapai to offer an Associate of Applied Science ("AAS") degree in Aviation Technology. Under the agreement, North-Aire provided the fixed-wing

flight course component, while Yavapai offered all ground training. North-Aire then invoiced Yavapai for the costs of the flight course, and Yavapai would then submit these invoices to the Department of Veterans Affairs ("VA"). The VA would then reimburse Yavapai for veterans who were enrolled in the course. After Yavapai submitted these invoices and received payment from the VA, North-Aire was reimbursed from Yavapai. The MOU specifically stated that Yavapai would not be able to pay North-Aire until after the VA provided reimbursement for the flight training program. (Doc. 174 at 69). And Yavapai stated that it would retain all the money from the ground courses. (*Id*. at 68).

Plaintiff Daniel Hamilton's claims here center on allegations that North-Aire and Yavapai defrauded the VA by failing to comply with VA regulations. To obtain payment from Veteran Affairs, Yavapai and North-Aire were required to comply with the "85/15 Rule." 38 C.F.R. § 21.4201(f)(2)(i). The 85/15 Rule requires that no more than 85% of students enrolled in a specific course are supported by the VA or by the institution at any given time. 38 C.F.R. § 21.4201(a). Thus, a school must enroll at least 15 percent of their students in a given course that do not receive institutional funding. Regulation 4201 also outlines the requirements for determining which students may be considered "nonsupported." In relevant part, students are considered non-supported if they are: (1) not veterans or reservists, and "are not in receipt of institutional aid," or (2) are "undergrads and non-college degree students receiving any assistance provided by an institution, if the institutional policy for determining the recipients of such aid is equal with respect to veterans and nonveterans alike." 38 C.F.R. § 21.4201(e)(2). If the student falls outside the definition of non-supported, then she must be considered "supported" by the institution.

Under this rule, the institution is responsible for accurately reporting these numbers to the VA. Separate 85/15 calculations are required whenever a course materially differs from another, such as through degree requirements, length or course objectives. *Id*. (e). VA regulations expressly require flight courses under a contract to comply with the 85/15 Rule. 38 C.F.R. § 21.4263(1). Under these regulations, only an institution of higher learning or a flight school—not a private company—can be approved for reimbursement.

*Id.* (a). The 85/15 Rule is specifically designed to prevent the abuse of the GI bill. *See Cleland v. Nat'l College of Business*, 435 U.S. 213, 217 (1978) ("[I]f an institution of higher learning cannot attract sufficient nonveteran and nonsubsidized students to its programs, it presents a great potential for abuse of our GI educational programs.") (internal quotation marks and citations omitted).

In early 2012, the VA Regional Office found that Yavapai violated the 85/15 Rule and suspended its flight programs. After this suspension, Yavapai decided to sunset its helicopter and fixed-wing vehicle training degree programs, and to create a new program that combined different concentrations into one-degree program—the AVT program.

In the Fall of 2013, Yavapai created this program, offering an AAS degree with four different concentrations. Under this new degree program, it was possible for students to obtain an AAS, and be counted as non-supported, without ever taking any flight courses. A VA Compliance Officer, Ms. Swafford, says that at some point she was aware that Yavapai was counting the students from the four separate concentrations together in the program but did not ever state that she instructed Yavapai to count the students together. (Doc. 170, Ex. 17, at 348-349). And Ms. Swafford did state that if she had been asked by Yavapai at the time, she would have told Yavapai that counting the concentrations together was permissible. (*Id.*). Another college in the region similarly counted their students for a flight training program. (*Id.*)

As it was consolidating its various flight degree programs, Yavapai also entered into an agreement with the Mountain Institute Joint Technical Education District ("JTED") to enroll high school students into the AVT program. Part of this agreement allowed JTED to pay the salaries of several AVT course instructors instead of paying the full amount to Yavapai for the tuition of the JTED students enrolled in the AVT program. In a letter to Ms. Swafford that requested guidance on 85/15 compliance, Yavapai employee Ms. Eckel noted that "[JTED] will compensate the college so that their students may enroll in college classes." (Doc. 170 Ex. 1 at 147). That letter also noted that Yavapai planned to count the JTED students as non-supported. (*Id.*). But the letter did not disclose the specific payment

arrangement between JTED and Yavapai. (*Id*.). Ms. Swafford later responded to this letter without objecting to the arrangement with JTED while also emphasizing that if part of a student's tuition was being paid by Yavapai, the student cannot be counted as non-supported. (*Id*. at 148). In her deposition testimony, Ms. Swafford agreed that "as long as the JTED students were paying the same tuition as the VA students . . . they were properly included in the 15 percent." (Doc. 170 Ex. 2 at 198). The JTED students, however, did not pay the same tuition as the VA students, and instead the college reimbursed instructor salaries. (Doc. 198, Ex. 8).

During this time, North-Aire also made payments to at least two non-supported students who were enrolled in their flight program. (Doc. 170, ¶ 70). And Yavapai and North-Aire worked to recruit non-VA students to enroll in the fixed wing program. (*Id*.).

While Yavapai was setting up the combined program, North-Aire and Yavapai conducted several meetings about the 85/15 Rule, and meeting notes indicate that the parties were aware that 85/15 compliance was an issue, and that they were seeking solutions to that problem. (Doc. 194 at 169-204).

In March 2015, the VA notified Yavapai that the four concentrations required separate calculations. (Doc. 195, Ex. 30). Because the Airplane Operations concentration included 94% students who were receiving assistance from the VA, the VA stated that Yavapai could no longer submit VA students for certification under the Airplane Operations program. (*Id*.).

The parties bring their various motions for summary judgment on the issues of whether Yavapai and North-Aire complied with the 85/15 Rule from 2012 to 2015.

**I.     Legal Standard**

    **A.     Motion for Summary Judgment**

Summary judgment is appropriate if the evidence, viewed in the light most favorable to the nonmoving party, demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When the parties file cross-motions for summary judgment, the Court

"evaluate[s] each motion independently, 'giving the nonmoving party in each instance the benefit of all reasonable inferences.'" *Lenz v. Universal Music Corp.*, 815 F.3d 1145, 1150 (9th Cir. 2015) (quoting *ACLU v. City of Las Vegas,* 333 F.3d 1092, 1097 (9th Cir. 2003)). Substantive law determines which facts are material and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "A fact issue is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002) (quoting *Anderson,* 477 U.S. at 248). Thus, the nonmoving party must show that the genuine factual issues "'can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.'" *Cal. Architectural Bldg. Prods., Inc. v. Franciscan Ceramics, Inc.*, 818 F.2d 1466, 1468 (9th Cir. 1987) (quoting *Anderson*, 477 U.S. at 250).

### B. False Claims Act

The False Claims Act imposes liability on any individual who knowingly defrauds the federal government. Section 3730(b) of the Act empowers individuals to "file suit on behalf of the United States seeking damages from persons who file false claims for government funds." *Hooper v. Lockheed Martin Corp.,* 688 F.3d 1037, 1041 (9th Cir. 2012). To prevail on a claim under the Act, a plaintiff must prove that the defendant acted knowingly, which includes "acts in reckless disregard of the truth or falsity of the information." *See* 31 U.S.C. § 3729.

Defendants may act with reckless disregard if they fail to familiarize themselves with the legal requirements for payment. *United States v. Mackby*, 261 F.3d 821, 828 (9th Cir. 2001). Reckless disregard includes the situation where a party "failed to make simple inquiries which would alert him that false claims are being submitted." *United States v. Bourseau*, 531 F.3d 1159, 1168 (9th Cir. 2008). Thus, individuals who seek payment from the government "have some duty to make a limited inquiry so as to be reasonably certain they are entitled to the money they seek." *Id*. But the reckless disregard standard requires

a showing of more than negligence, and a mere mistake is not sufficient to establish liability. *Hagood v. Sonoma Cty. Water Agency*, 81 F.3d 1465, 1478 (9th Cir. 1996).

**II. Analysis**

    **A. Admissibility**

        **1. Documents from the 2012 Case**

In his statement of facts for these motions, Plaintiff Hamilton cites repeatedly to documents from the record in the companion case, 12-cv-8193. (*See e.g.* Doc. 191 at 77). Rule 56(c) requires that parties asserting a fact "must support the assertion by. . . citing to particular materials in the record." Fed. R. Civ. Pro. 56(c)(1)(A). Documents that are filed in the companion case therefore cannot be properly cited to support an assertion in Plaintiff's motions unless they also appear in this record and will be disregarded in this order.[1]

        **2. Evidence in This Record**

In its reply, Yavapai also objects to the evidence cited by Hamilton in this record on several grounds. First, Yavapai argues that Hamilton did not properly authenticate much of the evidence he cites in his statement of facts. Yavapai further argues that much of the evidence that Plaintiff cites is inadmissible hearsay.

To authenticate evidence, a party must simply "produce evidence to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901(a). At summary judgment, "a party need only make a prima facie showing of authenticity so that a reasonable juror could find in favor of authentication." *United States v. Estrada-Eliverio*, 583 F.3d 669, 673 (9th Cir. 2003) (internal citations and quotation marks omitted).

As to the charts and spreadsheets that Yavapai objects to, those spreadsheets were provided to Hamilton as part of interrogatories in the 2012 case. (Doc. 192 Ex. 14). Yavapai described what each document was in its response to these requests. For example, Yavapai specifically identified Exhibit 11 as "Updated Aviation Students by Term

---

[1] Nor could this Court take judicial notice of those records, even if Plaintiff had requested it. *See M/V American Queen v. San Diego Marine Constr. Corp.*, 708 F.2d 1483, 1491 (9th Cir. 1983).

- 6 -

Spreadsheet." (Doc. 192 at 159). So a reasonable juror could find that these document are what Hamilton claims. As for hearsay concerns, these spreadsheets and charts are admissible for at least two reasons. First, they are opposing party statements, which makes them not hearsay under Rule 801. *See* Fed. R. Evid. 801(d)(2). Second, the exhibits are business records that were produced by Yavapai. As such they would be admissible even if they were hearsay. *See* Fed. R. Evid. 803(6). The records that Hamilton cites to that are in this record are therefore not improper and will be considered in this motion.

**B. Yavapai and Morgan's Motion for Summary Judgment**

Yavapai and Mr. Morgan move for summary judgment on all of Hamilton's remaining claims.

**1. Scienter**

First, Yavapai and Morgan argue that the record lacks any evidence that Yavapai or Morgan knowingly lied to the VA, because they consistently communicated with the VA about compliance with the 85/15 Rule.[2] Hamilton argues that Yavapai and Morgan submitted false claims by counting all of the students in the AVT program together, by counting the JTED students as non-supported and by counting part-time students as full time non-supported.

**a. Multiple Concentrations Together**

As to the counting of the separate concentrations together, including flight and non-flight students, the Court will grant Yavapai's Motion for Summary Judgment as to scienter. Yavapai disclosed to the VA that it was counting the concentrations together in official correspondence and asked for the VA's guidance, and a Yavapai employee says that she discussed counting the concentrations together with a Ms. Swafford. Yavapai also sent an additional email seeking guidance on one aspect of this new program, and in doing so disclosed the different concentration compositions. (Doc. 170-3, at 268). And while

---

[2] In its statement of facts, Yavapai asserts that the VA did not even include a reference to the 85/15 Rule until the 5th edition of the handbook, which came out in September 2015. (Doc. 170, ¶ 27). But a review of those handbooks reveals that the VA did note the 85/15 Rule in the earliest edition provided by Yavapai. (Doc. 170-2 at 200).

- 7 -

Ms. Swafford did not remember discussing counting the concentrations together with Yavapai at the time, she stated she would have told Yavapai that combining the various students together did not violate the 85/15 Rule. The VA repeatedly found that the AVT program which counted the various students together complied with the 85/15 rule during its compliance visits. And another school in the region, Embry Riddle Aeronautical University, had a program that counted different concentrations together that was also found to comply with the 85/15 Rule. (Doc. 170-1 at 126).[3] The only evidence that Hamilton points to is the plain text of the regulation, which is insufficient in this context to demonstrate scienter. Yavapai cannot be found liable here "not because [its] interpretation was correct, or reasonable but because the good faith nature of [its] action forecloses the possibility that the scienter requirement is met." *United States ex rel. Oliver v. Parsons Co.,* 195 F.3d 457, 460 (9th Cir. 1999). So Yavapai's Motion for summary judgment as to counting the separate concentrations together is granted.

### b. Counting Part-Time Students as Non-Supported

The 85/15 Rule notes that, when calculating compliance with the 85/15 Rule, a school should count civilian students with "full-time equivalency." 38 C.F.R. § 21.4201. The plain language of this regulation alone is strong evidence that Yavapai should have been on notice that a straight head count of students was not a permissible method to calculate its student ratios. Plaintiff Hamilton cites to documents produced by Yavapai that show that the school counted part time students as full-time non-supported without using a full-time equivalency calculation. Yavapai points to no evidence that it ever asked or received instruction from the VA on how to count part-time students. In her deposition, Ms. Aldrich also states that the school uses full-time equivalency in other areas. (Doc. 173-3 at 186). Yavapai does not point to any evidence to establish that it inquired as to how to count part-time students in its ratio calculations. Rather, it simply alleges that it

---

[3] To the extent that the government paid other programs in the region who also used combined concentration programs, that is evidence that the government paid out claims "despite actual knowledge that certain requirements were violated, and has signaled no change in position," and is an additional basis for granting summary judgment on materiality grounds. *See Escobar*, 136 S.Ct. at 2003-04.

- 8 -

instead used a head count and did not ever receive push-back from the VA at compliance visits or when it submitted its statement of assurance forms. However, the plain text of the regulation, combined with Yavapai's failure to explicitly inquire about using a straight head count could be used by a jury to establish scienter. So Yavapai's Motion for Summary Judgment as to counting part-time students is denied.

### c. JTED Students

But for to JTED's participation in the AVT program, Hamilton has pointed to enough evidence to survive Yavapai's motion summary judgment. Yavapai was not engaged in an open dialogue with the government on many important aspects of its JTED program. It did not disclose the fact that JTED paid course instructor's salaries in lieu of paying the normal tuition amount to Yavapai. (Doc. 170 at 146; Doc. 197 Ex. 8). Indeed, internal documents from Yavapai indicate that they were planning on giving the JTED students "reduced tuition," as a "long term solution" to the 85/15 Rule. (Doc. 194 at 176). To the extent that these payments were below the course enrollment costs for veterans, Yavapai should have disclosed this to the VA when it was seeking guidance from Ms. Swafford. But Yavapai instead simply stated that the high school would "compensate the college so that their students may enroll in the courses." (Doc. 170 Ex. 1 at 147).

But without disclosing the payment arrangement details of the JTED program to the VA, Yavapai cannot now rely on Ms. Swafford's response to this request for guidance to defeat scienter. *See e.g.*, *Parsons*, 195 F.3d at 465 (holding that failure to make appropriate disclosures prevents the grant of summary judgment as to scienter). Importantly, this JTED program was developed after Yavapai's flight training program was suspended for non-compliance with the 85/15 Rule and was discussed as a "solution" to the 85/15 Rule. Yavapai points to no evidence that it ever made the "simple inquir[y]" as to whether their arrangement with JTED was permissible. *See Bourseau*, 531 F.3d at 1168.

### C. North-Aire's Motion for Summary Judgment

North-Aire moves for summary judgment on all of Hamilton's remaining claims against it. North-Aire's Motion for Summary Judgment turns on whether Hamilton can

demonstrate that it assisted Yavapai in defrauding the government. It argues that because Yavapai was responsible for submitting the 85/15 compliance forms, it cannot be liable for causing a false claim to be submitted under the Act. North-Aire further alleges that it was not involved in the JTED calculations (Doc. 173 at 7). Because there are remaining issues of fact as to scienter, materiality, and conspiracy, the Court will deny North-Aire's motion for summary judgment.

### 1. Scienter

The VA's regulations provide that a "contracted portion of a flight course must meet the requirements of [Regulation 4201] for each subcontractor." 38 C.F.R. 21.4263(l). And in the Ninth Circuit, a party "need not be the one who actually submitted the claim forms in order to be liable." *United States v. Mackby*, 261 F.3d 821, 827 (9th Cir. 2001). Indeed, "the FCA reaches any person who knowingly assisted in causing the government to pay claims which were grounded in fraud, without regard to whether that person had direct contractual relations with the government." *Id*. (internal citations and quotation marks omitted). The FCA was thus intended "to reach what has been known as the ostrich type situation where an individual has buried his head in the sand and failed to make simple inquiries which would alert him that false claims are being submitted." *Bourseau*, 531 F.3d at 1168 (internal citation and quotation marks omitted).

Because North-Aire was receiving payments through Yavapai from the VA for its flight training programs, it had a "duty to familiarize [itself] with the legal requirements for payment." *Mackby*, 261 F.3d at 828. To survive summary judgment, Hamilton must point to evidence that North-Aire "failed to make simple inquiries which would alert [it] that false claims are being submitted." *Bourseau*, 531 F.3d at 1168.

There is evidence in the record that indicates that North-Aire was aware of the existence of the 85/15 Rule and should have accordingly familiarized itself with the rule's requirements. North-Aire attended meetings with Yavapai where compliance with the rule was discussed. (Doc. 194 at 169-207). During those meetings, a Yavapai employee raised the possibility that the JTED students should not be counted as non-supported under the

rule. (*Id*. at 174). The MOU between Yavapai and North-Aire provided that North-Aire was to "assist" maintaining 85/15 compliance. (Doc. 174 at 72). The MOU also provided that Yavapai would not be able to reimburse North-Aire until after the VA paid Yavapai. (Doc. 174 at 69). And Mr. Hamilton emailed Mr. Scott in November 2012 to warn him that he believed Yavapai was violating the False Claims Act in the way it counted its students. (Doc. 191, Ex. 28). This evidence could be used to support a finding that North-Aire was aware of the 85/15 Rule, and of Yavapai's arrangement with JTED.

Yet there is little evidence in the record that North-Aire made independent inquiries into whether their arrangement with Yavapai and the VA complied with the VA's regulations. This absence of independent review could support a finding of reckless disregard, as North-Aire received millions of dollars through this arrangement. *See Mackby*, 261 F.3d at 828. The fact that the VA may have hypothetically directed North-Aire to discuss compliance with Yavapai instead of the VA if North-Aire had contacted the VA (which it did not), does not excuse North-Aire's failure to make this independent inquiry.

North-Aire was also involved with recruiting students into the program and paid for some students that counted as non-supported to enroll in their flight courses. These students were not veterans. North-Aire points to no evidence in the record that shows it sought advice from the VA as to whether this arrangement was permissible. In his affidavit, Mr. Scott alleges that this money was equally available to veteran and non-veteran students alike. (Doc. 174 Ex. 4 ¶ 17). However, there is no evidence that North-Aire ever actually sought out veterans or made payments to veterans to enroll in the program. This is additional evidence that could support a finding that North-Aire acted with reckless disregard as to whether it was causing or assisting in the submission of false claims to the VA.

///

///

///

- 11 -

### D. Yavapai and North-Aire are not entitled to summary judgment on the issues of materiality and conspiracy.

#### 1. Materiality

Under the False Claims Act, "the term 'material' means having a natural tendency to influence, or be capable of influencing payment or receipt of money or property." 31 U.S.C. s 3729(b)(4). The Supreme Court in *Escobar* explained the different factors that can demonstrate materiality or immateriality. *Escobar*, 136 S.Ct. at 2003. If there is "evidence that the defendant knows that the Government consistently refuses to pay claims . . . based on noncompliance" then that is evidence that can support a finding of materiality. *Escobar*, 136 S.Ct. at 2003. However, if the Government has paid "a particular claim in full despite its actual knowledge that" the 85/15 Rule was violated, that is strong evidence that the requirement is not material. *Id*. The Supreme Court also clarified that "[w]hether a provision is labeled a condition of payment is relevant to but not dispositive of the materiality inquiry." *Id*. The 85/15 Rule explicitly states that the VA shall not approve students for payment in courses that exceed the 85/15 ratio, which supports Hamilton's argument regarding materiality. 38 C.F.R. § 21.4201 (a)

Defendants allege that the VA was aware of the method and basis of their 85/15 calculations through program audits, as well as the allegations of Mr. Hamilton, and so the violations here cannot be material. But the fact that the VA was aware of Mr. Hamilton's *allegations* of misconduct as early as 2012 does not mean that the government had actual knowledge that Yavapai was submitting false claims, especially since Yavapai did not disclose their payment arrangement with JTED and other relevant facts about the program until a later date. (Doc. 169 at 14). That the VA's Office of Inspector General and U.S. Attorney's Office did not bring an enforcement action based on allegations of misconduct is not evidence that the VA would refuse to pay claims had it known that Yavapai was violating 85/15 and cannot support a finding of immateriality. Violations of the 85/15 Rule are material at a general level, as Yavapai was suspended twice specifically for violating the 85/15 rule. Indeed, the fact that the VA suspended payment based on violations of the

85/15 Rule before the issues in this case demonstrates that Yavapai was aware that the VA "consistently refuses to pay claims . . . based on noncompliance." *Escobar*, 136 S.Ct. at 2003. Thus, the Court cannot find that these violations were immaterial.[4]

### 2. Conspiracy

To be liable for a conspiracy under the FCA, the evidence must establish that the Defendants "had the purpose of getting the false record or statement to bring about the Government's payment of a false or fraudulent claim." *Allison Engine Co. v. United States ex rel. Sanders*, 553 U.S. 662, 672–673 (2008).

The MOU between North-Aire and Yavapai states that Yavapai could not pay North-Aire unless and until the VA paid Yavapai for the flight training programs. (Doc. 174 at 69). In meeting minutes where both Yavapai and North-Aire were present, a Yavapai employee noted that JTED students should not be counted as non-supported. (Doc. 194 at 174). Mr. Morgan indicated at multiple points there was concern about complying with the 85/15 Rule. (*Id*. at 172, 174). Mr. Morgan also stated that if Yavapai could get JTED students to count as non-supported, then the government would pay out claims for the training program, and Yavapai would not need additional civilians. (*Id*.). North-Aire was present at subsequent meetings where Yavapai discussed seeking out and recruiting JTED students. (Doc. 194 at 179). North-Aire was also originally planning to contribute to a scholarship fund for Yavapai students, and this was part of their MOU with Yavapai. (Doc. 194 at 176; Doc. 174 at 68). And North-Aire made payments to non-supported students enrolled in their flight courses. All of this evidence could be used by the jury to find the existence of a conspiracy to submit false claims to the VA. Thus, summary judgment as to the conspiracy claim for all parties is denied.

### E. Hamilton's Cross-Motion for Summary Judgment

The parties do not contest falsity as to the Summer of 2014—Yavapai admits that it enrolled 91% veterans in the AVT program that Summer. The only remaining issue is

---

[4] Because Hamilton's false claim act count survives, Yavapai's motion for summary judgment on the false records count is denied.

- 13 -

whether Yavapai submitted claims for Summer 2014 knowingly or with reckless disregard. Because there remain issues of fact as to whether Yavapai acted with the requisite scienter during Summer 2014, Hamilton's Motion for Partial Summary Judgment and Yavapai's Cross Motion for Partial Summary Judgment are denied.

### 1. 85/15 Provisions

The 85/15 Rule provides that the VA "shall not approve an enrollment in any course for an eligible veteran, not already enrolled, for *any period* during which more than 85 percent of the students enrolled in the course are having all or part of their tuition fees or other charges paid for them by the educational institution or the VA." 38 C.F.R. § 21.4201(a) (emphasis added). The regulations also provide that the school shall submit their 85/15 calculations "no later than 30 days after the beginning of each regular school term (excluding summer sessions)." 38 C.F.R. § 21.4201(f)(2)(i). The regulations do not, however, specifically explain how to handle new veterans that enroll during the summer.

### 2. Scienter

The parties present different pieces of evidence in aid of their motions. Hamilton points to a suspension letter from the VA that specifically notes that Yavapai violated the 85/15 Rule in the Summer 2010 and 2011 terms by enrolling more than 85% supported students. This letter was authored when the VA first suspended the program. Yavapai disputes that it ever received this letter, or that its employees were aware of it. Hamilton also points to deposition testimony from both Ms. Aldrich and Mr. Morgan that acknowledge that the school needed to comply with the 85/15 Rule during the summer, even if it was not required to report to the VA during the summer. (Doc. 184 at 264). Hamilton also points to the plain text of the regulation, which says that 85/15 compliance is required for "any period."

Yavapai points to an email from its employee, Sandra Aldrich to Ms. Swafford in February 2012, asking whether students that were enrolled in the summer were exempt from complying with the 85/15 Rule. (Doc. 184-1 at 282). Because Yavapai sought guidance from the VA on these issues, Yavapai argues that Mr. Hamilton cannot

- 14 -

demonstrate that it acted recklessly as to the Summer of 2014. But absent a response email from the VA that states that all enrollments in the Summer are exempt from the 85/15 Rule, the Court cannot conclude at this stage that Yavapai lacked scienter.

Because there is evidence that could both support a finding of scienter, as well as evidence that could support a finding that Yavapai lacked scienter, the Court will deny both motions.

**IT IS HEREBY ORDERED** that Yavapai Community College and John Morgan's Joint Motion for Summary Judgment (Doc. 169) is **GRANTED IN PART AND DENIED IN PART** as follows:

Any claims that Defendants violated the False Claims Act by counting all the students enrolled in the combined AVT program are dismissed.

Summary Judgment is denied as to all other claims.

**IT IS FURTHER ORDERED** that North-Aire's Motion for Summary Judgment (Doc. 173) is **DENIED.**

**IT IS FURTHER ORDERED** that Plaintiff Hamilton's Motion for Partial Summary Judgment (Doc. 175) is **DENIED.**

**IT IS FURTHER ORDERED** that Yavapai Community College's Cross Motion for Partial Summary Judgment (Doc. 183) is **DENIED**.

**IT IS FURTHER ORDERED** that Plaintiff Hamilton's Motion to Seal (Doc. 198) is **GRANTED**. The Clerk of Court is directed to file under seal Exhibits 12, 15, 20, 21, 27, and 32 (Doc. 197).

Dated this 26th day of March, 2019.

G. Murray Snow
Chief United States District Judge